IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Ashley M. Martin, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security, )<br><br>Defendant. ) | Civil Action No. 6:15-4886-CMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on March 21, 2013, alleging she became unable to work on May 1, 2009. She subsequently amended her alleged onset date of disability to September 1, 2013 (Tr. 418). Both claims were denied initially and on reconsideration by the Social Security Administration. On January 16, 2014, the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The ALJ, before whom the plaintiff and Tonetta Watson-Coleman, an impartial vocational expert, appeared on January 22, 2015, considered the case *de novo*, and on April 6, 2015, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 9, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

(2)    The claimant has not engaged in substantial gainful activity since September 1, 2013, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairment: Budd-Chiari Syndrome (20 C.F.R. § 404.1520(c) and 416.920(c).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she can perform postural activities occasionally. The claimant must avoid concentrated exposure to hazards. She cannot perform fast-paced production work or work requiring rigid quotas.

(6)    The claimant is capable of performing past relevant work as a security guard, a retail cashier, a garment bagger, and as a janitor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2013, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

2

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 27 years old on her amended alleged onset date of disability (September 1, 2013) and 29 years old at the time of the ALJ's decision (April 6, 2015). She has a high school education and past relevant work as a caregiver, airport security guard, retail cashier, security guard, garment bagger, janitor, and daycare worker (Tr. 42, 55).

In February 2009, the plaintiff sought emergency treatment for abdominal pain and was worried about possible endometriosis (Tr. 474). Hematological testing and urinalysis indicated multiple abnormalities (Tr. 478-80). She was discharged after refusing pain medication (Tr. 475). An October 15, 2010, abdominal CT scan indicated moderate hepatomegaly with heterogenous parenchymal enhancement and multiple small nonspecific enhancing nodules suspicious for cirrhosis and dysplastic/regenerative nodule formation; significant portal varices suggesting portal hypertension; and a complex cystic structure possibly in the right ovary (Tr. 470). On October 25, 2010, the plaintiff underwent an esophagogastroduodenoscopy due to left upper quadrant abdominal pain and vomiting with hematemesis, with a known history of liver disease (Tr. 463). The impression was mild erosive gastritis (Tr. 464). She was also noted to have an abnormally high prothrombin (clotting) time (Tr. 465).

The plaintiff underwent a liver biopsy on November 3, 2010, which indicated inactive cirrhosis of undetermined etiology, with prominent zone 3 fibrosis with sinusoidal fibrosis, suggesting a possible chronic venous outflow obstruction such as chronic Budd-Chiari Syndrome[2] (Tr. 446-49). An addendum noted that the plaintiff was diagnosed

---

[2]Budd-Chiari Syndrome is an "often fatal thrombotic occlusion of the hepatic veins, marked clinically by hepatomegaly, weight gain, ascites, and abdominal pain." *Taber's Cyclopedic Medical Dictionary* 2183 (20th ed. 2005).

with cirrhosis three years ago based on a CT scan and that she "was lost to follow-up due to loss of health insurance" but now was pursuing workup (Tr. 453).  The plaintiff was "not on any hepatotoxic medications, and the patient is not obese and has no history of alcohol abuse" (Tr. 453).  A November 17, 2010, abdominal sonogram indicated a mildly enlarged liver compatible with reported cirrhosis, normal hepatopetal flow in the left and main portal veins, and thickening of the gallbladder wall.  The right portal vein could not be well seen and required further assessment  (Tr. 440-41).

On May 3, 2011, the plaintiff was seen at the University of Kansas Medical Center Hepatology Clinic by gastroenterology fellow Jeffrey Michalak, D.O.  Dr. Michalak evaluated the plaintiff due to cirrhosis and prior abnormal liver testing, with current symptoms of very mild intermittent nausea and mild constipation (Tr. 482).  He noted that the plaintiff did not have insurance at the time of the abnormal test results and as such was unable to pursue evaluation at that time (Tr. 482).  Upon examination, Dr. Michalak noted very trace nonpitting lower extremity edema (Tr. 483).  Dr. Michalak's impression was cirrhosis based on the prior biopsy and imaging studies, portosystemic varices based on imagining studies, and a history of cystic ovaries.  Further evaluation was scheduled (Tr. 484-85).

A May 24, 2011, abdominal MRI indicated mild hepatomegaly with a diffusely heterogeneous pattern of enhancement; multiple small enhancing foci throughout the liver with enhancement characteristics and with regenerating nodules; and moderate narrowing of the main portal vein producing portal venous hypertension with prominent varicosities within the left upper quadrant and back. (Tr. 491).

The plaintiff was next examined on May 31, 2011, by hepatologist Ryan Taylor, M.D. (Tr. 623-26).  Dr. Taylor noted that the plaintiff's hematuria had resolved, she had intermittent lower abdominal pain but no upper abdominal pain, had upper right quadrant pain once or twice a month, and her occasional nausea and vomiting had resolved

6

(Tr. 623). Upon examination, her abdomen was mildly distended, with mild hepatomegaly present (Tr. 624). Dr. Taylor opined, "Currently the patient appears to be clinically compensated with low MELD [Model for End-Stage Liver Disease] scores at this time, however, does have evidence of cirrhosis" (Tr. 624).

On June 1, 2011, Dr. Taylor reported that hepatic venography studies and a liver biopsy showed evidence of Budd-Chiari Syndrome with hepatic outflow obstruction including the IVC (inferior vena cava) appearing to be completely occluded at the level of the liver with a number of collaterals seen (Tr. 486). Due to the signs of chronic outflow obstruction, Dr. Taylor opined that the plaintiff would benefit from a transjugular intrahepatic portosystemic shunt ("TIPS") to attempt to open the passageway for hepatic blood flow, despite the risk of possible decompensation, and that the plaintiff be evaluated for a liver transplant (486, 631).

A June 5, 2011, treadmill test with myocardial perfusion study was deemed abnormal with left anterior descending ("LAD") distribution ischemia present and a left ventricular cavity that was mildly dilated with stress (Tr. 504-05). The plaintiff developed chest pain with the Bruce protocol and had a reduced exercise capacity, sustaining activity for only five minutes and 14 seconds (Tr. 505). Left ventricular systolic function was at the lower limits of normal, and mild global hypokinesis was present (Tr. 505).

A June 6, 2011, abdominal and pelvic CT scan indicated cirrhosis of the liver without discrete hepatic mass; complete obstruction of the intrahepatic IVC, perisplenic and retroperitoneal varices consistent with portosymtemic shunting; and interval development of subacute hemoperiotoneum (abdominal fluid collection) (Tr. 499-500). A large amount of fluid in multiple areas, two of which communicated with each other, was noted (Tr. 719). On June 7, 2011, the plaintiff was treated for a post-biopsy intra-abdominal hematoma (Tr. 515). A June 10, 2011, upper endoscopy ultrasound indicated a normal esophagus but findings suggestive of chronic pancreatitis (Tr. 519-20).

7

A June 13, 2011, abdominal ultrasound indicated cirrhosis and patent portosystemic varices, reversal of flow in the patent portal veins and splenic vein, and apparent occlusion of the IVC, with a small amount of reversed flow similar to findings on the IVC study. (Tr. 494-95).

Also on June 13, 2011, Atta Nawabi, M.D., a transplant surgeon, performed a pre liver transplant evaluation. Dr. Nawabi noted the plaintiff's current diagnosis of Budd-Chiari Syndrome, manifested with ascites, lower extremity edema, and hepatosplenomegaly. 1+ pitting edema was noted on examination (Tr. 512). Dr. Nawabi reported that if the plaintiff were cleared from a cardiopulmonary psychosocial standpoint, she had no contraindications for a liver transplant (Tr. 513).

A June 15, 2011, Doppler echocardiogram performed for the purpose of liver transplant evaluation indicated moderately elevated central venous pressure (Tr. 532-33). The EKG indicated nonspecific T wave changes (Tr. 556). Concurrent evaluation notes were positive for signs and symptoms of decreased appetite, diaphoresis, malaise/fatigue, headaches, photophobia, chest pain, claudication, dry skin and itching, joint pain, neck pain, stiffness, bloating, abdominal pain, change in bowel function, nausea/vomiting, hematuria, nocturia, difficulty with concentration, excessive daytime sleepiness, insomnia, and depression (Tr. 536-37).

On June 16, 2011, Randall E. Genton, M.D., a cardiologist, examined the plaintiff as part of her liver transplant evaluation. Dr. Genton reported that the plaintiff had no symptoms of angina, heart failure, or arrhythmia. He referred the plaintiff for an echocardiogram and a thallium stress test (Tr. 537-38).

On June 18, 2011, Dana J. Hawkinson, M.D., evaluated the plaintiff for a liver transplant (Tr. 533). Dr. Hawkinson cleared the plaintiff for a liver transplant when it became necessary (Tr. 536). The plaintiff was also re-examined by Dr. Taylor on June 18, 2011, for liver transplant evaluation (Tr. 533-36). Dr. Taylor noted:

8

> Overall, the patient says that she is doing well, however, continues to have bouts of spontaneous abdominal pain or discomfort . . . will also complain of occasional lower extremity swelling and discomfort as well as persistent fatigue and occasional migraine headaches. Last few weeks, she has also had some sweats, which occur spontaneously . . . and resolve spontaneously as well.

(Tr. 534). Dr. Taylor's impression was end-stage liver disease secondary to Budd-Chiari Syndrome, obesity, development of subacute hemoperiotoneum as seen on the June 6, 2011, CT scan, and apparent occlusion of the IVC as seen on the June 13, 2011, abdominal ultrasound (Tr. 535). Dr. Taylor noted, "At this point, it appears the patient should be okay to get a liver transplant when it is indicated" (Tr. 536).

On July 12, 2011, Dr. Taylor reported that the decision had been made to hold off on a liver transplant because the plaintiff's MELD score was normal[3] (Tr. 629). However, if she subsequently showed signs of decompensation, the decision would be reconsidered. "The consideration was for potential future of surgical shunting to help with her outflow obstruction. Unfortunately, her MELD would be too low to qualify for transplant graft" (Tr. 627). Specifically, TIPS could not be performed due to "lack of suitable targets with her IVC occlusion," and a surgical shunt would be "anatomically difficult . . . There is a possibility that [the plaintiff] may need to be referred to another tertiary level center with experience in surgical shunts that may be required" (Tr. 629). Dr. Taylor noted that "[s]he feels very good at this time without any specific complaints. No abdominal pain, nausea, vomiting, swelling, chest pain, shortness of breath, blood in her stool, fever, chills, jaundice, or pruritus. She has actually been exercising regularly and drinking water and has actually lost

---

[3] MELD (Model for End Stage Liver Disease) is a numerical scale used to prioritize patients waiting for a liver transplant. The range is from 6 (less ill) to 40 (gravely ill) and is calculated using the most recent laboratory tests. The MELD score determines how urgently a patient needs a liver transplant within the next three months. *See* MELD and the Waiting List for Liver Transplant, Sutter Health CPMC, available at: http://www.cpmc.org/advanced/liver/patients/topics/MELD.html (last visited on December 29, 2016).

nearly 10 pounds since her initial presentation.  She is planning an upcoming trip to South Carolina for two weeks and has made arrangements to leave for that tomorrow.  Otherwise the plaintiff denies symptoms of encephalopathy or ascites [abnormal accumulation of fluid in the abdominal cavity]" (Tr. 627).

On August 29, 2011, gastroenterology/hepatology fellow Nathan Tofteland, M.D., examined the plaintiff in the pre-transplantation clinic (Tr. 620-22).  He noted that she was also referred "for TIPS placement but unfortunately because her IVC was completely occluded at the level of the liver there was no access site for the systemic shunt placement" (Tr. 620).  Her present symptoms included some lower extremity edema and pain, with painful lymphadenopathy of the neck, although her abdominal pain, nausea, and vomiting had improved (Tr. 620).  On examination, shotty lymphadenopathy in the bilateral anterior cervical chain was noted, with pharyngeal erythema (Tr. 621).  Dr. Tofteland noted that "we do not have an underlying etiology for her diagnosis of Budd-Chiari syndrome" and that "[h]er liver disease appears to be very well compensated at this time.  Her current MELD score is 9" (Tr. 621-22).

On September 6, 2011, Q. Michael Ditmore, M.D., a state agency physician, reviewed the plaintiff's medical records and opined that she was capable of performing a full range of light work (Tr. 682-87).  Dr. Ditmore noted that the plaintiff had been diagnosed with end stage liver disease with cirrhosis due to hepatic outflow obstruction (Tr. 683).  He further noted that, although the plaintiff had no contraindications to a liver transplant, her low MELD score of 9 (almost the lowest score possible) precluded putting her on the transplant list (Tr. 683).

A September 13, 2011, abdominal MRI indicated vascular changes in the liver consistent with Budd-Chiari Syndrome, unchanged since the prior examination; numerous hyperenhancing liver lesions without significant change that likely represent regenerating/hyperplastic nodules; and severe stenosis of the intrahepatic IVC with

associated large collaterals (Tr. 752-54). On October 31, 2011, Dr. Taylor noted that the plaintiff was recently prescribed Lovenox and Coumadin and was having some problems with easy bruising and ecchymoses, which were confirmed on examination (Tr. 770-72). Mild splenomegaly and borderline hypertension were also noted on examination (Tr. 771-72). The plaintiff reported no nausea, vomiting, or abdominal pain, but did have upper back pain (Tr. 770). Dr. Taylor noted that with the plaintiff's "current compensated status [] it would be early to list her for liver transplantation, however, if she should show signs of progressive decompensation or develop other complications of cirrhosis . . . she would then be eligible to be activated for transplant" (Tr. 771). Dr. Taylor recommended continued monitoring of the plaintiff's condition (Tr. 771-72).

On March 25, 2012, the plaintiff went to the emergency room with complaints of abdominal pain (Tr. 864). An abdominal ultrasound showed a mildly heterogeneous liver with no focal abnormality or perihepatic fluid collection (Tr. 872). The plaintiff was treated with IV medications, and she was discharged to her home the following day in improved condition (Tr. 870). The plaintiff reported that she was feeling "much better" with "very little pain" in her abdomen (Tr. 856).

At the request of the state agency, the plaintiff was evaluated by psychologist Cashton Spivey, Ph.D., on June 19, 2013 (Tr. 886-89). The plaintiff was working 18 hours a week at her janitorial job (Tr. 887). The plaintiff reported excessive sleep, mild reduction in attention and concentration, and a low energy level (Tr. 887). The plaintiff was unable to perform serial sevens, her mood was mildly sad, and her affect slightly blunted (Tr. 888). Dr. Spivey's conclusion was rule out depressive disorder, not otherwise specified (Tr. 889). He opined that the plaintiff "may display difficulty managing funds independently and accurately" based on her difficulty performing serial seven calculations, although she was currently managing her own funds (Tr. 889).

11

On June 27, 2013, Harriett R. Steinert, M.D., performed a consultative physical evaluation of the plaintiff (Tr. 892). The plaintiff's height was 5'5", and she weighed 229 pounds (Tr. 893). Laboratory testing showed that some of the plaintiff's liver enzymes were elevated, but her bilirubin levels were normal (Tr. 897). Dr. Steinert reviewed a "Hematology note from 5/8/12; ER note from 3/25/12." The plaintiff reported abdominal pain, nausea, fatigue, and ankle swelling. She was taking Coumadin and Ultram, but was experiencing abdominal pain about three times a week, which would last all day, and had nausea and vomiting every other day (Tr. 892). Upon examination, Dr. Steinert noted a flat affect and limited range of motion of the knees due to obesity (Tr. 893-94). Dr. Steinert noted the diagnosis of Budd-Chiari Syndrome with cirrhosis and also stated: "Limitations: She says she has frequent episodes of abdominal pain and nausea and vomiting" (Tr. 895).

On July 5, 2013, Tom Brown, M.D., a state agency physician, reviewed the plaintiff's medical records and opined that she was capable of performing light work that required no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling; and no more than frequent balancing (Tr. 100-01). Dr. Brown noted that the plaintiff's examination showed no significant findings except for decreased knee flexion due to obesity (Tr. 101). He also noted that a recent hepatic panel showed some elevated liver enzymes, but was otherwise within normal limits. Dr. Brown felt that the plaintiff's subjective complaints of disabling symptoms were not credible (*id*.).

On August 12, 2013, the plaintiff saw James Dove, P.A., to find out the results of recent x-rays and blood work (Tr. 905). Mr. Dove reported that a physical examination was generally unremarkable (Tr. 905-07).

On September 23, 2013, at the Medical University of South Carolina ("MUSC"), the plaintiff underwent an MRI of her abdomen, which showed findings consistent with Budd-Chiari Syndrome, resulting from chronic thrombosis of the IVC

between the level of the liver and the right atrium (Tr. 971). The MRI indicated Budd-Chiari hepatic morphology with stable nodular AV shunts throughout the liver and a new wedge-shaped hyperenhancing area of the left kidney, possibly representing an area of infarct (Tr. 927). There were extensive collateral vessels, but no evidence of portal vein thrombosis or biliary dilation (Tr. 971). The plaintiff's renal arteries and veins were normal (*id*.).

On October 15, 2013, the plaintiff was referred to MUSC after reporting hip and liver pain and having abnormal liver function tests (Tr. 903, 905-908). She reported no longer being on the liver transplant list as Coumadin therapy was successful and she moved out of state (Tr. 908). P.A. Dove noted that the plaintiff's Coumadin level was not at goal due to the plaintiff's noncompliance with her appointments (Tr. 903).

On November 22, 2013, the plaintiff was first examined by gastroenterology and hematology fellow Kevin Myers, M.D., who noted the history of Budd-Chiari with cirrhosis and ongoing intermittent right upper quadrant pain, frequent constipation, frequent fatigue, and occasional nausea and vomiting (Tr. 965-66). Dr. Myers noted, "I need her prior records as it is difficult to make any decisions about her future care without knowing what has already been done" (Tr. 967). In addition, the plaintiff wanted to wait until records were received to proceed with further evaluation "since she does not have insurance" (Tr. 967). He further noted that the plaintiff "seems to be very well compensated and I truly wonder if she was on a transplant list given her normal [MELD] now. If she was indeed on the transplant list she must have been much worse off than she is now" (Tr. 967). Dr. Myers ordered laboratory work up and asked that the plaintiff "request her entire record from Kansas for me to review" (Tr. 967).

On November 26, 2013, George Walker, M.D., a state agency physician, reviewed the plaintiff's medical records and opined that she was capable of performing light work that required no climbing of ladders, ropes, or scaffolds; and no more than occasional

13

climbing of ramps or stairs, stooping, kneeling, crouching, or crawling (Tr. 117-18). Dr. Walker felt that, given the medical evidence, the plaintiff's subjective complaints of disabling symptoms were not credible (Tr. 118). Also in July and November 2013, non-examining psychologists Holly Hadley, Psy.D., and Lee Coleman, Ph.D., opined that the plaintiff's affective disorder was not severe (Tr. 88, 113).

On February 28, 2014, but he again noted "I had requested records from KU at last appointment but have not received anything." The plaintiff was noted to be "doing well" but still had significant fatigue. In the interim, Coumadin was initiated and gradually increased to a therapeutic dose (Tr. 960). Dr. Myers again noted that if the plaintiff was "indeed cirrhotic her [MELD] is very low. She must have improved greatly if she indeed was ever listed for liver transplant (Tr. 962). On October 15, 2014, the plaintiff underwent an endoscopy with gastric biopsy (Tr. 941).

On January 6, 2015, the plaintiff was first evaluated by Charles Greenberg, M.D. (Tr. 914), a specialist in hematology and oncology (Tr. 986). Dr. Greenberg noted that the etiology of the Budd-Chiari cirrhosis was not clear, that the plaintiff had underlying arthritis, and that she recently experienced a possible arterial thrombosis in her kidney (Tr. 914). He opined that close followup and further testing was needed, and she was "taking control of her health care" and "signed up for a health insurance plan" (Tr. 914). Dr. Greenberg noted, "Hopefully we will be able to assist her in managing her serious disorder." (Tr. 914). The plaintiff reported intermittent abdominal pain and chronic fatigue. Upon examination, Dr. Greenberg noted 1+ bilateral pitting edema, normal motor function, and good strength throughout (Tr. 916). Coumadin was prescribed again, in addition to ongoing medications of flexeril and tramadol (Tr. 920, 924).

On February 22, 2015, Dr. Greenberg wrote a letter to the plaintiff's attorney stating that the plaintiff has "liver cirrhosis and a hypercoaguable state with recurrent blood clots that have caused her to experience Budd-Chiari syndrome and renal infarction."

14

Despite taking Coumadin, she "continues to have blood clotting problems. Her liver function is severely affected . . . The hypercoagulable state is related to her liver injury." He opined that "this patient cannot work physically or mentally for any consistent length of time during an 8 hour work week 5 days a week. This has continuously been a problem since September 2013." Dr. Greenberg noted that "patient experiences chronic fatigue, abdominal pain with episodes of severe pain secondary to continued blood clotting problems that interfere on a daily basis with any work." He noted that the plaintiff's ability to concentrate was impaired by her medication and by her underlying cirrhosis and that "patient may ultimately need a liver transplant in the near future" (Tr. 979).

On August 19, 2015, following the ALJ's decision, Dr. Greenberg wrote a second letter explaining further:

> Ashley Martin suffers from a life-threatening form of liver disease called Budd-Chiari syndrome. In this disease blood vessels clot that supply blood to the liver. The direct result of this is liver failure and ultimately death unless the patient gets a liver transplant.
>
> The patient initially saw a gastroenterology fellow Dr. Myers at MUSC back in January 2014 and he states that the patient's disease appears to be well compensated. He is a fellow in training and does not have 30 years of experience treating patients with this syndrome. The choice of his wording may be accurate for his experience but fails to convey the clinical status of the patient fairly.
>
> At the time of his evaluation the patient was working 2 part-time jobs for less than 40 hours a week in an effort to try to pay for her medical insurance. Her effort to do so was extraordinary and one that cannot be sustained based on my seeing her in March 2015.
>
> Her disease is chronic and progressive in nature and will ultimately lead to her continued decline. When I saw her she was exhausted and was having difficulty managing her affairs. Livers are extremely scarce and patients must progress to near death before than can get a liver transplant. The term well compensated means she is coping with her illness.

15

. . . While [patients] may be compensated they have toxins accumulating in their blood and they may become encephalopathic. This means they cannot think clearly and could be unable to manage their own affairs.

We can then expect at some time Ashley will be unable to manage any of her affairs and will be uncompensated. This disease is progressive and she will need to be able to support herself in a manner that will allow her to survive and qualify for liver transplant. She does not have the capacity to continue with a sustained work effort due to her liver disease and its effect on her ability to work, concentrate and function to the capacity required to sustain an income.

It is my opinion that although this patient currently still functions she [is] not in any capacity to work full time when her liver is failing. The cause of death in liver disease is often major bleeding and the patient will have a risk for having major hemorrhage. Her prognosis is very poor and it is my hope that she will get adequate medical care that can be used to sustain her health to the point where she qualifies and we can find a liver suitable for transplantation. There are no guarantees.

It is often difficult reading a medical chart to evaluate the nature of a person's struggle with a fatal illness and the qualifications of those writing the letter. I have spent 25 years at Duke University and the last 6 at the Medial University of South Carolina. I have treated many patients with life-threatening thrombotic disorders. The Budd-Chiari syndrome is clearly the worst disorder I care for because it leads to liver failure and death from this process.

(Tr. 982-83).

The plaintiff testified that at the time of her administrative hearing she was working two jobs — as a garment bagger for a dry cleaner, four days a week, four to four and one-half hours per day, and in a janitorial position (performing light tasks such as dusting and supervising other workers), five days a week, two and one-half to three hours per day (Tr. 43).    In the garment bagger position, the plaintiff did not have to be continuously working while at the job; rather, she testified that "[i]t's kind of at our pace, and it's kind of as the clothes come down.  So we have a lot of breaks, and some days are real slow and we have to wait . . . it's kind of like a lot of waiting around" (Tr. 50).  However, she

16

still missed work due to being ill, and her employer reduced her hours to four days a week to give her an "extra day of just, I guess, rest" (Tr. 50).

In her janitorial position, the plaintiff cleaned offices by dusting, wiping down desks, sweeping, and managing/supervising the employee who cleans the bathrooms, takes out trash, and mops, which she does not do herself (Tr. 48). "I pretty much am there to [] just dust the main offices and make sure the building is cleaned to satisfaction" (Tr. 48). Accommodations made for her on the job included her not having to lift the trash, lift heavy mop buckets, or use the backpack vacuum because "I can't really lift too much strenuous stuff of I kind of get in [] pain" (Tr. 49).

The plaintiff testified that she lived with her parents. While at home, she generally rested and did "normal day-to-day" activities (Tr. 44-45). These activities included reading books, doing laundry at her own pace, going to church on Sundays, and visiting with friends sometimes (Tr. 45). On a function report, the plaintiff reported that she usually prepared her own meals, although her mother sometimes prepared dinner for her (Tr. 359). She did housework, including putting dishes in the dishwasher, washing and folding her clothes, and vacuuming (*id*.). She did not drive a car because she did not have a driver's license (Tr. 360). She shopped in stores for groceries and personal items, and she was able to manage her own finances (*id*.). The plaintiff's hobbies included reading, watching television, and making bracelets (Tr. 361). Her social activities with others included eating and watching movies, which she did on a monthly basis (*id*.).

The plaintiff testified that she felt fatigued all of the time from her medical condition as well as the side effects of her medications (Tr. 50-51). She testified that she had constant abdominal pain in her liver and abdominal swelling (Tr. 52-53). She testified that her doctor had prescribed water pills because her legs and ankles were swelling. She stated that she would be unable to work at a full time job "because of the medication and the pain" and noted that she was fired from her security job due to medical reasons and

6c:15-cv-04886-CMC    Date Filed 01/04/17    Entry Number 23    Page 18 of 30

absences (Tr. 53). She asked her physician if she could change medication due to the effects, but he told her that was the main medication she could take and explained that her symptoms from the medication are "a little increased" because it is the liver that breaks down the medication (Tr. 51). The plaintiff testified that she has "everyday pain" in her liver, but "if I do too much, it's like I get these shooting pains . . . they can last for an hour or [] more" (Tr. 52). The episodes of shooting pain occur daily and "can happen a couple of times a day too" and are not always precipitated by increased activity, but occur "[s]ometimes without any warning" (Tr. 52). She also had nausea and loss of appetite (Tr. 54).

The ALJ asked the vocational expert to assume a hypothetical individual with the plaintiff's vocational characteristics who was limited to light work involving only occasional postural activities and no concentrated exposure to work hazards such as heights or dangerous machinery (Tr. 56). Additionally, the individual was limited to jobs that would not require fast-paced production or rigid quotas. The vocational expert testified that the hypothetical individual would be capable of performing the plaintiff's past relevant work as a garment bagger, security guard, cashier, airport security guard, and daycare worker (*id*.).

The vocational expert further testified that if the same limitations applied but with a sedentary exertional level, all of the past work would be excluded (Tr. 56-57). However, other sedentary, unskilled jobs would be available, such as a document preparer (DOT 249.587-018), addresser (DOT 209.587-010), and charge account clerk (DOT 205.367-014) (Tr. 57). If the individual needed "a 15-minute break every hour during the work day," the vocational expert opined that the worker "would not be able to retain or maintain employment" (Tr. 57). Further, "if a person is having difficulty attending or concentrating to task for 15 percent of the workday or more" they would not be employable (Tr. 57-58). Finally, absences "on a regular basis more than one time a week" would preclude employment (Tr. 58).

18

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to give Dr. Greenberg's opinion appropriate weight and (2) improperly evaluating her subjective complaints. The plaintiff further argues that the Appeals Council erred in failing to remand for further consideration of Dr. Greenberg's supplemental opinion (pl. brief at 1).

### Medical Opinions

The plaintiff first argues that the ALJ failed to properly consider the February 2015 opinion of Dr. Greenberg (pl. brief at 17-21). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory

19

> diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As set forth more fully above, on February 22, 2015, Dr. Greenberg provided a letter stating that the plaintiff suffered from chronic fatigue and abdominal pain with episodes of severe pain secondary to blood clotting problems and also had problems in concentrating due to her medication and underlying cirrhosis. He opined that the plaintiff could not "work physically or mentally for any consistent length of time during an 8 hour work week 5 days a week" and that this had "been continuously a problem since September 2013" (Tr. 979).

The ALJ considered this opinion and gave it "little weight," noting that Dr. Greenberg's opinion was inconsistent with Dr. Myer's report that the plaintiff's disease was "very well compensated" (Tr. 28 (citing Tr. 967)). The plaintiff argues that this reason is not supported by substantial evidence because Dr. Myers was only a gastroenterology fellow and he did not have the opportunity to review the plaintiff's prior workup from Kansas, which Dr. Myers himself stated he would like to see (pl. brief at 19-20 (citing Tr. 967)).

The undersigned finds no error. The ALJ thoroughly reviewed the objective medical evidence, which was consistent with Dr. Myers's characterization of the plaintiff's disease. The evidence showed that, although the plaintiff had been diagnosed with Budd-Chiari Syndrome, the condition had not progressed to the point of being disabling. The record shows that she was evaluated for a liver transplant, but was found to not medically qualify for placement on the transplant list (Tr. 629, 771). As the ALJ discussed

20

in detail, despite the plaintiff's diagnosis of liver disease, her physical examinations were essentially normal (Tr. 24-28; *see* Tr. 892-95, 905-07, 916).  Hepatic laboratory studies showed elevated liver enzymes, but were otherwise within normal limits, an MRI of the plaintiff's abdomen showed no evidence of portal vein thrombosis or biliary dilation, and the plaintiff's renal arteries and veins were normal (Tr. 25; *see* Tr. 101, 897, 971).

The ALJ further stated that Dr. Greenberg's opinion was inconsistent with the plaintiff's work schedule (Tr. 28).  The plaintiff argues that this reason also is not based upon substantial evidence because the two part-time jobs she was performing at the time of the administrative hearing were an effort to obtain health insurance and were performed with accommodations (pl. brief at 20-21).  The undersigned finds no error.  As of the date of the plaintiff's administrative hearing, she continued to work two part-time jobs, for about 30 hours per week (Tr. 28, 43-44).  Although the ALJ found that these jobs did not rise to the level of substantial gainful activity that would disqualify the plaintiff from consideration for benefits, they demonstrated that the plaintiff could do more than Dr. Greenberg claimed. *See* 20 C.F.R. §§ 404.1571, 416.971 (stating that even if work that a claimant has done does not constitute substantial gainful activity, it may show that she was able to do more work than she actually did).  The ALJ noted that, in addition to working 30 hours per week, the plaintiff had no difficulty performing normal day to day activities including reading books, doing laundry at her own pace, preparing meals, putting dishes in the dishwasher, washing and folding her clothes, vacuuming, shopping in stores for groceries and personal items, watching television, making bracelets, attending church on Sundays, and eating and watching movies with friends (Tr. 25-26, 28; *see* Tr. 44-45, 359-61).  As argued by the Commissioner, these activities demonstrated that the plaintiff's Budd-Chiari Syndrome was not causing disabling functional limitations during the applicable period.

The ALJ gave "significant" weight to the opinions of state agency consultants Drs. Brown and Walker, who completed physical residual functional capacity ("RFC")

21

assessments based upon a review of the plaintiff's medical records in July and November 2013, respectively, finding the plaintiff could perform a limited range of light work (Tr. 26-27; *see* Tr. 100-101, 117-18). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

The plaintiff argues that the ALJ erred in relying on the assessments by the state agency medical consultants because they "were under the mistaken impression that [the plaintiff] was 'found not to be a candidate for a liver transplant'" (pl. brief at 21; *see* Tr. 101, 118). However, the record clearly indicates that the plaintiff was evaluated for a liver transplant in 2011, but her medical condition did not qualify at that time (Tr. 629 ("Currently, we will hold on listing for liver transplant as her MELD is normal; however, if she should show signs of decompensation or clinical change a consideration would be then for listing, as she overall appears to be meeting the appropriate criteria."), 771 ("It was felt that with the patient's current compensated status that it would be early to list for liver transplantation; however, if she should show signs of progressive decompensation or

22

develop other complications of cirrhosis such as hepatocellular carcinoma she then would be eligible to be activated for transplant.")).  There is no indication in the record that this status changed at any time prior to the ALJ's decision.  Accordingly, the undersigned sees no error in the state agency physicians' statements.

The plaintiff further argues that the state agency physicians "did not have the benefit of reviewing key medical evidence . . . including the medical records from the [MUSC] dated from September 13, 2013, onward and Dr. Greenberg's opinion," and, therefore, it was error for the ALJ to give their opinions significant weight (pl. brief at 21 (citing Tr. 901-81)).  The undersigned finds no error.  An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, C.A. No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *report and recommendation adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).  Here, it is clear that the ALJ considered the later-submitted reports, along with all of the other evidence of record, in assessing the plaintiff's RFC (Tr. 25-28).  In fact, the ALJ found limitations in addition to those opined to by the state agency consultants based upon his review of the evidence (Tr. 27). As discussed above, substantial evidence supports the ALJ's finding that the plaintiff's liver disorder did not cause disabling limitations as of the date of the ALJ's decision.

Following the ALJ's decision, the plaintiff submitted to the Appeals Council another letter from Dr. Greenberg, which is dated August 19, 2015.  The letter addressed questions from the plaintiff's attorney (Tr. 980-85), and, in it, Dr. Greenberg opined that the plaintiff "does not have the capacity to continue with a sustained work effort due to her liver disease and its effect on her ability to work, concentrate and function to the capacity required to sustain an income. . . . [A]lthough this patient currently still functions she is not in any capacity to work full time when her liver is failing" (Tr. 982-83).  Dr. Greenberg stated

23

that "well compensated" means that the plaintiff is coping with her illness at present time, but her disease "is chronic and progressive in nature and will ultimately lead to her continued decline" (Tr. 982). As for Dr. Myers' statement in January 2014 that the plaintiff seemed "to be very well compensated,"[4] Dr. Greenberg stated the following: "[Dr. Myers] is a fellow in training and does not have 30 years of experience treating patients with [Budd-Chiari Syndrome]. The choice of his wording may be accurate for his experience but fails to convey the clinical status of the patient fairly" (Tr. 982). The Appeals Council considered the letter, but concluded that it did not provide a basis for changing the ALJ's decision (Tr. 2, 5). The August 2015 letter was made part of the administrative record (Tr. 5, 982-83).

The plaintiff argues that the Appeals Council erred in failing to remand the matter to the ALJ for consideration of Dr. Greenberg's August 2015 letter (pl. brief at 22-26). The law provides that evidence submitted to the Appeals Council with the request for review must be considered in deciding whether to grant review "'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir.1991) (en banc) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990)). Evidence is new "if it is not duplicative or cumulative." *Id*. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* The United States Court of Appeals for the Fourth Circuit has explicitly held that "[t]he Appeals Council need not explain its reasoning when denying review of an ALJ decision." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir.2011). The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct

---

[4]Dr. Myers further stated: "I truly wonder if she was on a transplant list given her normal [MELD] now. If she indeed was on the transplant list, she must have been much worse off than she is now. . . ." (Tr. 967).

legal standard. *Id*. at 704.  "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

The ALJ in *Meyer* issued a decision denying benefits and noted therein that Meyer failed to provide an opinion from his treating physician. *Id.* at 702.  When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician that detailed Meyer's injuries (from a fall) and significant physical restrictions.  The Appeals Council summarily denied review but made the letter part of the administrative record.  The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician, and thus the report should be accorded only minimal weight.  The district court adopted the recommendation. *Id.* at 704.  The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report filled an "evidentiary gap" emphasized by the ALJ. *Id.* at 707.  The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered, noting that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence. *Id.*  The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record.  Assessing the probative value of competing evidence is quintessentially the role of the fact finder.  We cannot undertake it in the first instance." *Id.*

The plaintiff's argument that remand is required for consideration of the August 2015 letter fails.  As argued by the Commissioner, Dr. Greenberg's August 2015 opinion is duplicative of his February 2015 opinion and, therefore, had minimal additional

25

probative value (*see* Tr. 979, 982).  The Appeals Council considered the evidence but found, appropriately, that it would not change the ALJ's decision (Tr. 1-5).  Both opinions state that the plaintiff is unable to work due to symptoms of liver failure (Tr. 979, 982-83).  However, as discussed above, the ALJ reasonably rejected Dr. Greenberg's February 2015 opinion as inconsistent with the evidence showing that the plaintiff's Budd-Chiari Syndrome had not progressed to the point of disability and that the plaintiff still functioned well on a daily basis (Tr. 28).  As Dr. Greenberg's August 2015 opinion essentially reiterates his February 2015 opinion, does not include any additional functional limitations, does not fill an evidentiary gap, and does not impact the ALJ's assessment of the earlier opinion, the undersigned finds no error in the Appeals Council's decision to decline to remand for further consideration of such evidence.

Based upon the foregoing, the undersigned finds that the ALJ's evaluation of the medical opinions was not in error and was based upon substantial evidence.

### Subjective Complaints

The plaintiff next argues that the ALJ erred in evaluating her subjective complaints (pl. brief at 26-30).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals

26

panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 16-3p[5], 2016 WL 1119029, at *5

---

[5]SSR 16-3p supersedes SSR 96-7p.  The ruling eliminates the use of the term "credibility" and clarifies that subjective symptom evaluation is not an examination of an individual's character.  2016 WL 1119029, at *1.  The effective date of SSR 16-3p is March

("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). SSR 16-3p states that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. " 2016 WL 1119029, at *9. The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

_____

28, 2016. 2016 WL 1237954, at *1. While the ALJ issued his decision prior to the effective date of SSR 16-3p, the two-step process and factors for evaluating a claimant's subjective symptoms remains substantially the same as that for assessing the credibility of a claimant's statements under SSR 96-7p.

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *7. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that while the plaintiff's impairments could reasonably be expected to produce the plaintiff's pain or other symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 25). Specifically, the ALJ noted the plaintiff's testimony regarding her fatigue, abdominal pain, swelling in the abdomen and lower extremity, depression, and medication that caused drowsiness and loss of appetite (Tr. 25). However, he found that the plaintiff's stated symptoms were inconsistent with the objective medical evidence and her reported activities (Tr. 25-28).

As discussed above, the evidence of record shows that although the plaintiff has been diagnosed with Budd-Chiari Syndrome and although that condition could lead to additional functional limitations in the future, the plaintiff at the time of the ALJ's decision remained capable of performing a limited range of light work. The plaintiff was evaluated for a liver transplant, but was found to be too healthy to qualify for placement on the transplant list at that time (Tr. 629). It was noted that she would be reconsidered for placement on the transplant list at a later time if her disease progressed to the point that it became necessary, but her condition remained stable as of the date of the ALJ's decision (Tr. 629, 771). Despite the plaintiff's liver disease, her physicians reported essentially

29

normal physical examination findings (Tr. 25-28; *see* Tr. 892-95, 905-07, 916). Furthermore, the plaintiff engaged in a wide range of activities, including working 30 hours per week at two part time jobs, performing routine household chores, shopping in stores, going to church, making bracelets, reading and watching television, and eating meals and watching movies with friends (Tr. 25-26, 28; *see* Tr. 44-45, 359-61).  The ALJ correctly observed that this level of activity undermined the plaintiff's allegations of significant functional limitations.

Based upon the foregoing, the undersigned finds that the ALJ's assessment of the plaintiff's subjective complaints was without error and based upon substantial evidence.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 4, 2017
Greenville, South Carolina